# UNSWORN DECLARATION IN SUPPORT OF FORFEITURE COMPLAINT

## INTRODUCTION

I, Nayit Limery Gonzalez, being first duly sworn, hereby depose and state as follows:

1. Your affiant is a Special Agent with the United States Secret Service (USSS) assigned to the San Juan Resident Office. As such, your affiant is an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrest for, offenses enumerated in 18 U.S.C.

2. Your affiant has been a Special Agent with the USSS since June 2023. From June 2023 to present, I have been assigned to the USSS San Juan Resident Office, where I have worked investigations involving complex financial crimes. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer, I am authorized to execute warrants issued under the authority of the United States.

3. This Unsworn Declaration is submitted in support of a verified complaint of forfeiture. Under 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of 18 U.S.C. §§ 1956, or any property traceable to such property," is subject to civil forfeiture to the United States. In addition, under 18 U.S.C. § 981(a)(1)(A), with cross references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of" a wire fraud offense or offenses committed in violation of

18 U.S.C. § 1343 are subject to civil forfeiture to the United States. Therefore, I have not set forth each and every fact learned during the course of this investigation.

## PROPERTY TO BE FORFEITED

Approximately 50,221.254086 USDT seized from the following third-party virtual currency addresses:

- 0xbebdccf5988cdd39da2c63a5d1d9093a2254be38;
- 0xfa2c6c55e5be0f4b7b3e9370f4b1f094975107ce; and
- 0x8f14fb59fd773c1124433ddaa0af08f9762737c4

## BASIS FOR FACTS CONTAINED IN THIS UNSWORN DECLARATION

1. The investigation revealed that Victim A was a social media user of the social media platform Snapchat[1]. Victim A reported that while using the Snapchat application on their phone, viewed multiple accounts purporting to be various celebrities. These purported celebrity accounts were linked to "Signal"[2] groups labelled "xo.eth". These links would send Victim A to groups that would send "crypto signals"[3].

2. Victim A indicated that they added one account with the username "centralceenewss"[4] hereinafter Subject A. According to Victim A, they

---

[1] Snapchat is a popular social media application that allows users to communicate through sending photographs or chats to each other. Users are able to do this in a one-on-one setting, as well as a group message setting.
[2] Signal is a popular messaging application. Signal allows its users to communicate via private and group chats, as well as audio and video calls.
[3] "Crypto Signals" were described as tips, trends, and values of the crypto currency market.
[4] Central Cee is a famous British rapper, the account was purporting to be Central Cee, like the other accounts referenced in paragraph 14.

communicated with Subject A via the messaging application "Signal".

3. Victim A stated that Subject A advised them that he manages a group that studies the trends of the crypto market. Subject A stated he does not want any money up front, but that he would request 15% of Victim A's monthly earnings as a commission for the tips on the crypto market. Victim A stated that Subject A had a British accent when talking to him.

4. Subject A instructed Victim A to download various crypto related applications to include "Crypto News," "CoinGecko," and "bitcoin.com" in order to "stay up to date" and get the latest news on cryptocurrency. Subject A sent links directly to Victim A for him to download these applications.

5. These links that appeared to be for cryptocurrency news applications were sent to Victim A directly from Subject A. Victim A clicked on all these links and downloaded the apps from the links provided.

6. From my training and experience, I know that bad actors will often send links

posing as legitimate applications to prospective victims. While these links might look harmless, and even legitimate, they frequently contain malicious code designed to target the victim and accounts held on their device.

7. According to Victim A, they kept all their funds in their "Coinbase wallet" prior to meeting Subject A. Victim A stated that they transferred their funds to their "Trust Wallet" because it makes it easier to buy crypto and has lower fees that at

"Coinbase." Victim A already had created both their "Coinbase Wallet" and their "Trust Wallet" prior to meeting Subject A. Victim A further stated that they use the "Face ID" feature on their iPhone to login to their "Trust Wallet". Victim A indicated that they have a pin to login to their Trust Wallet but does not remember the pin as they only use the "Face ID" feature.

8. Victim A reported that on or about July 12, 2024, they checked their "Trust Wallet" holdings and realized that approximately 32,451.558669 of the Stablecoin[5], Tether (USDT)[6], hereinafter "USDT", was unwillingly transferred out of their "Trust Wallet" to SUBJECT ADDRESS A where they remain the sole funds held at SUBJECT ADDRESS A. Victim A reported that after being told to download the application "bitcoin.com", he checked his "Trust Wallet" and realized the above.

9. The USSS reviewed the transactions associated with Victim A's trust wallet. Blockchain analysis conducted by the USSS revealed that on or about July 12, 2024, approximately 10,816 USDT was transferred to SUBJECT ADDRESS B where it became comingled with other funds for a total of 10,865.90 USDT. The additional 49.90 USDT that is held at this address remains as leftovers from the laundering transactions outlined in paragraphs (F.)(k.) to (F.)(w.).

[5] Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDC is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

[6] Tether (USDT): Tether Limited ("Tether") is a company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

10. On or about July 15, 2024, SUBJECT ADDRESS A transferred approximately 10,820 USDT to SUBJECT ADDRESS C, where it became comingled with other USDT for a total of 16,026353 USDT.




*Figure 1 – Initial Transactions*

11. The comingled USDT in SUBJECT ADDRESS C was sent from address 0x9118228b3a298b855de907fc4e669748baed54c0, hereinafter “0x911”, on or about July 14, 2024; two transactions were conducted when sending these funds. The first transaction was for approximately 126.947732 USDT, under 30 minutes later, a second transaction was conducted for approximately 5,079.721596 USDT, for a total of 5,206.669328 USDT.

12. On or about July 3, 2024, SUBJECT ADDRESS B sent approximately 9,000 USDT to 0x911. This 9,000 USDT was used to fund the two transfers as

outlined in F.(k.)(1.).

13. On or about July 3, 2024, address 0x18b4c086652feb4c2fed668e61b45a3fb3d218c1, hereinafter "0x18b", sent approximately 14,025.075402 USDT to SUBJECT ADDRESS B. These funds were subsequently used to fund the transfer for 9,000 USDT outlined in F.(m.).

14. On or about July 2, 2024, seven USDT transactions were sent from address 0xc55c625e9854b3b75d617162c89b7bcee07156b2, hereinafter 0xc55 for various amounts totaling approximately 14,025.075402 USDT. Those amounts in chronological order, from first to last, are as follows: 6.092744 USDT, 1,218.303067 USDT, 3,0463890248 USDT, 3,046.890248 USDT, 3,046.262564 USDT, 3,046.262564 USDT, 614.373967 USDT. These transactions were subsequently used to fund the transfer for 14,025.075402 USDT outlined in F.(n.)

15. The transaction outlined above in F.(o.) was funded by a 14,025.075402 USDT transaction sent from an address controlled by the non-custodial exchange, N.Exchange[7], to 0xc55.

16. From my training and experience, I know that individuals will often send multiple transactions to the same address as an attempt to obfuscate the source of the funds. There is no legitimate purpose to break up a single transaction, into 7 individual transactions to credit the same account in rapid succession. This results in paying extra, and unnecessary fees that would have been saved by sending the 14,025.075402 USDT

[7] N.Exchange is a cryptocurrency platform that offers a variety of services such as token-swapping, and as an intermediary between users and other crypto exchanges.

as a single transaction.

17. According to the block explorer Etherscan[8], it costs approximately $0.64 in fees to send one transaction of 14,025.075402 USDT, and it cost approximately $5.00 to send that same amount in 7 different transactions, increasing the fees by approximately 781.25%.




*Figure 2 - Unnecessary Fees*

18. On or about August 6, 2024, the USSS sent a request for account information to N. Exchange requesting records on the transactions leading up to the 14,025.075402 USDT transfer to 0xc55 explained in paragraph F.(p.) On or about, August 7, 2024, N. Exchange provided a spreadsheet titled 7uJhm89dA5PC15HkeKArRkQ34gFjesLsrxaiBHHrcn38 with all of the users' transaction on their network.

[8] Etherscan is a free to use, open source blockahin explorer. From my training and experience, I know Etherscan to be true and accurate as it takes data directly from the blockchain, and places it in an easy-to-read format.

19. 7uJhm89dA5PC15HkeKArRkQ34gFjesLsrxaiBHHrcn38, hereinafter, "7uJhm", completed 5 swaps of tokens and coins in the N. Exchange network before ultimately transferring 14,025.075402 USDT to address 0xc55, as outlined in paragraph F.(p.)

20. Two of the five swaps in the N. Exchange account directly funded the transfer above in F.(t.). On July 2, 2024, these swaps began as 95.8779041 Solana and were swapped to 14,318.7902 USDT on the Solana blockchain. Continuing on or about July 2, 2024, the user swapped the 14,318.7902 USDT on the Solana network for 14,025.075402 USDT on the Ethereum blockchain.

21. There is no legitimate business for swapping Solana to USDT on the Solana blockchain and to USDT on the Ethereum blockchain. This results in an extra transaction and extra fees being paid when the individual could have swapped Solana directly for USDT on the Ethereum network.

22. From my training and experience, I know that individuals will swap their assets between different stablecoins and different Blockchains to further obfuscate and launder their illicit funds as the conduct eliminates the transparency of using a single blockchain.



4. Based on the foregoing facts, I believe that sufficient probable cause exists to show there is present material evidence of a commission of a violation of a Federal Law. There is probable cause to believe the subject property constitutes proceeds of a criminal wire fraud in violation of Title 18 U.S.C. § 1343 and those proceeds are subject to seizure and forfeiture pursuant to Title 18 U.S.C. § 981(a)(1)(C), and Title 28 U.S.C. § 2461(c). There is further probable cause to believe that a greater amount of funds constitute property involved in money laundering transactions. These funds are accordingly subject to forfeiture pursuant to Title 18 U.S.C. §§ 981 and 982.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief, pursuant to 28 U.S.C, § 1746.

In San Juan, Puerto Rico, this 1st day of October, 2026.

NAYIT A LIMERY GONZALEZ
Digitally signed by NAYIT A LIMERY GONZALEZ
Date: 2026.10.01 21:53:09 -05'00'

Nayit Limery Gonzalez
Special Agent
United States Secret Service (USSS)